Thank you, and may it please the Court, Franklin Lemon on behalf of Appellant Maria Del Pilar Nino, I'd like to reserve three minutes for rebuttal. The District Court erred in dismissing Ms. Nino's amended complaint on a motion to dismiss for three reasons. First, the District Court's conclusion that Ms. Nino failed to plead a breach of contract claim was incorrect. Here, the trial period plan is a contract under Florida law because it satisfies the four essential requirements set forth in the Russell v. NationStar mortgage case, which I cite in our brief. Those four essential requirements are an offer, acceptance, consideration, and sufficient specification of the terms of the agreement. Just out of curiosity, I'm sure there are thousands and thousands of these trial period plans throughout the country, not just in Florida. Have you found any case that's ever found one of those to be a contract? That I can recall as I stand here today, Your Honor, no, I have not. This would be a case of first impression, finding one of these TPPs to be a contract. If this were a case that had proceeded to summary judgment, yes, Your Honor, in the way that you phrased that is correct. But it's important to note that this is being evaluated on a motion to dismiss, where all inferences are supposed to be conveyed in my client's favor, and that was not done here, as you will see. The record clearly establishes that there was an offer. If Ms. Nino fulfilled the trial period plan requirements, she would receive a permanent loan modification that required her to pay $1,342 a month. There was acceptance. Ms. Nino made the payments as required under the solicitation that was provided to her from Flagstar. The contract, if there was one, said she would make these reduced payments, and she would satisfy the other requirements of the trial payment plan, correct? The only other requirements that were conveyed to her is that she had to provide all the documents requested by Flagstar. We'll get through this a lot faster instead of you reframing my question. If you can answer it, please do. If you can't, tell me. There were other conditions in this TPP, correct? Yes, Your Honor. Did she timely comply with those additional conditions, or did it have to await her bankruptcy? She provided all of the documents that were requested of her, one of which was the subordination of the region's loan, which she accomplished through the bankruptcy proceeding. All right, so there's no violation of this so-called contract, at least until she satisfied a condition precedent, which was she gets the subordination by virtue of the bankruptcy, correct? I would not agree with that statement as you've made it, Your Honor, because there are very contradictory provisions within the TPP itself as to when the contract will be formed. There is one statement in the record. I'm not trying to give you a hard time. You simply stood up and said she accepted it by virtue of making these payments. So I asked you, weren't there other things she had to do? And I think the answer to that is yes. There were other things that Flagstaff requested her to do. However, if you look at certain language in the TPP itself, the argument can be made that she did not even need to do what she did in order to establish a contract because there is a specific provision in the TPP that merely says once you make all the payments, we will send you a modification agreement. And that sentence conveys to her that all she needs to do is make the three payments. It doesn't say anything about having to provide the additional materials. That being said, she did provide all of the materials that were requested, including the subordination of the Regents' loan through the bankruptcy proceeding. And when did she do that? That was something that was accomplished during the 20 months between the initiation of the TPP and the eventual execution of the contract by Ms. Nino in December of 2014, I believe. Right. So doesn't it matter when? Not according to the language of the agreement that they sent to her that simply says once you make all the payments, we will send you a modification agreement. And she continued to make the reduced payments throughout the period when she was under the impression that she would be given a modification agreement. And they continued to accept the reduced payments. Am I correct that the issue here is the consideration issue and that the only consideration that you offered and continue to offer is the bankruptcy? That is the only consideration that we have relied upon and that we continue to rely upon, yes, Your Honor. But that is completely sufficient. If for no other reason than Flagstar's counsel admitted that it was consideration because it was not a requirement in order to subordinate the Regents' loan. Opposing counsel conceded an oral argument before the magistrate judge on September the 7th of 2017 that Ms. Nino could have obtained the subordination of the Regents' loan through a state court foreclosure action that was pending at the same time. Did they ask her, did they suggest bankruptcy? Did they ask her to go through bankruptcy?  I was not working with Ms. Nino at that period of time. She had a different counsel. I'm not sure if the suggestion of bankruptcy came from Flagstar or whether it came from the other attorney that she was working with at that period of time. But be that as it may, it's clearly that the bankruptcy is a form of consideration because it was not something that she was required to do at the time. Wait a minute. So let's stop right there. I'm just dumbfounded about your argument about all she had to do was make these payments. I'm looking at this trial period plan agreement and it says, which you were relying upon I guess, to qualify for a permanent modification you must make the following trial period payments in a timely manner. And then it lists three payments. That's what you're relying upon, right? Yes, Your Honor. So what do you do about the next sentence which says, after all trial period payments are timely made and you have submitted all the required documents, your mortgage will be permanently modified. Do we just, for some reason, you don't think we should read that sentence? You should certainly read that sentence, Your Honor. But you told me a minute ago that you didn't think that she had to do anything. You could read the agreement in a way that she didn't have to do anything more than make the three payments. And I'm just trying to figure out how you could possibly stand here and make that argument. Because in a separate place on page 415 of the record that you're quoting from, there's the statement that says that all you have to do is make the three payments. And on the page before, on page 414, Where's that other statement? On record ID 414, it's the first page of the TPP, it says to accept this offer you must make your first monthly trial period payment. And that's on the first page of the document that they sent to her. Okay, so your argument is that she accepted it, and then she just didn't meet the requirements for a permanent modification for months and months and months. Is that your argument? She accepted it by making the initial payment. They requested the additional documentation, which is referred to on the second page, the 415 that your Honor was quoting from. The paragraph before that said this is the first step towards qualifying for more affordable mortgage payments. This is a process. It certainly ended up being a process. But it's a process that Ms. Nino completed and complied with and did everything that she was required to do under the TPP. Once she provided the subordination, then she got a permanent modification. That is correct, Your Honor. So where's the problem here? The problem is that the modification that she got, once they gave it to her, they had already breached it. She got a modification, which essentially you're claiming took too long to get, and she was damaged in the meantime. But that time period was what it took her to satisfy the requirements, not for the trial payment period, but for the language in the trial payment period to get a permanent modification. That's what it seems to say on its face. It did not take her the entire 20-month period to get all the information to Flagstar. She got the information to Flagstar much sooner than that. It then took Flagstar a specific period of time or a certain period of time, the exact duration of which I don't have off the top of my head, from when she gave her the subordination of the Regents' loan to when they finally gave her the contract and said, you need to sign this by— Is that the time period you're complaining about then? From the subordination to when she actually signed the permanent modification? That and the fact they added $6,000 in attorney's fees to the loan when they said they were not going to do so, and when they added $100,000 in new principal based on the delay, which it's our position was not entirely her fault. Now, granted there was some delay because she had to get the subordination, but that's not entirely attributable to her given that Flagstar delayed on the back end. Notwithstanding the fact that the original document that they sent her said that once you make the three payments, we're going to send you the permanent loan modification, but she didn't get the permanent loan modification until 20 months later. I just read you what the actual agreement says, and it does not, I would say with all due respect, it doesn't even come close to saying what you said it says. Well, I respect what you're saying, Your Honor, but I think that there's other portions of the agreement that are more favorable to my client's position, and seeing as we're on a motion to dismiss and all inferences are supposed to be reviewed in my client's favor, you know, she satisfied all of the requirements for the TPP. She formed the contract, and we allege sufficiently that it was breached, and she suffered damages as a result. When you say that by the time they gave it to her, they had, when they gave her a new contract and they had already breached it, what are you saying? So she was told that she had to sign the TPP by December of 2014, or the next month they were going to foreclose on her. At the time she signed it, under the duress, as we allege in the complaint, they had added on the $6,000 in attorney's fees, even though the TPP term said there would be no additional fees, and they added $100,000 in new principal by saying that the payments that she made of $1,300, which was the lower amount that she had made the entire time, didn't sufficiently pay the interest in principal that had been accruing during the TPP. During the time period when the loan hadn't been permanently modified. That's correct. She was never informed by Flagstar that she needed to make a separate, a different amount. They didn't add anything. They simply didn't subtract it. She always owed this $100,000 until the loan got modified. Is that a fair statement? No, Your Honor, because the amount of principal that she owed from the time she asked for the modification to the time when she gave it actually increased. So it was new money that was added to the value of the loan that she did not owe at the time she went and asked for the modification. It was added to the value of the loan, or it was the principal, or it was the deficiency in principal that was accumulating because of her lowered payments? It could be construed as the deficiency, but it was also additional interest based on what they were alleging was a deficiency because she only paid the $1,300 as she was offered under the TPP. But what you want her to get is you want her to get the benefit of the lower interest rate and the credit for having paid the full payment amount, even though she's paying a partial payment amount, prior to the permanent modification. That's what you're claiming she lost here. I see that I'm out of time, Your Honor. May I continue to answer your question? You can answer, certainly, then you should stop. The $30,000 that she paid during the duration of the TPP, which is calculated by the $1,300 amount, the lower monthly payment, versus the time and period it took, that was not properly allocated to her loan once the permanent modification was put in place because it was basically consumed by the new interest that they added to the prior loan balance, rather than attributing it to principal and interest like it should have been had they properly applied. Is that in the TPP, that this is what they're going to do with that money? The TPP is not clear on what they're going to do with that money because the TPP does not contemplate the period lasting 20-plus months like it did. It only contemplates it lasting three months. All right. I think we have an argument in hand. May it please the Court? My name is Gina Valdatero and I represent Flagstar Bank FSB in this case. You had just asked a question about whether the TPP contemplated the arrearage, so the difference between the TPP payment she was making and what her regular payments were, being rolled into or capitalized into the outstanding principal balance of the loan. And that is addressed in the TPP. It's on the second page. There's a question that says, How will I know if my loan can be modified permanently and how will the modified loan balance be determined? The second sentence says, Any difference between the amount of the trial period payments and your regular mortgage payments will be added to the balance of your loan along with any other past due amounts as permitted by your loan documents. While this will increase the total amount that you owe, it should not significantly change the amount of your modified mortgage payment as that is determined based on your total monthly gross income, not your loan balance. What happened here is her ultimate loan modification, the one she did receive in December, and I believe it was December of 2013, not 2014. And what about the attorney fees? Is that in there also? So all it says with respect to fees, and the reading of fees I think is far more narrow than what Mr. Lamont has assumed, it says that you will not be charged any fees for this trial plan or a permanent modification. And it says if your loan is modified, we will waive all unpaid late charges. It's silent as to the fees that were accrued for attorney's fees. She was in foreclosure during this time period. That foreclosure was dismissed after they signed the permanent modification. But during that time, they weren't proceeding to sale and were trying not to aggressively pursue foreclosure because she was working through these issues and trying to get the subordination. But ultimately, Flagstar did incur attorney's fees. Now the mortgage, which is the original document that governs these parties' relationship, the mortgage permits Flagstar to either capitalize that into the outstanding balance and or seek recovery of it from the borrower. She seems to be claiming that the $6,000 was charged to her as a part of the TPP. Is there any place where we can look that corroborates your saying that that was charged in connection with the foreclosure and not the trial period plan? I'm looking for a copy of the actual loan modification agreement itself. The final modification agreement. I think my colleague may have it. It may set forth that amount. It wasn't a fee that was charged for the loan modification. Several years ago, I modified my loan because my bank had lowered interest rates and offered it. And they said, you know, here's a monthly payment. It will cost you in order to do this because it's similar to a refinance. That is the type of fee that they're referring to is sort of the overhead cost for the institution of modifying the loan. And that's not what was charged to her. What was charged to her were attorney's fees permitted under the original mortgage document. You think those attorney fees were articulated in the modification document? I would have to check. I'm not entirely sure if it's in there. Okay. All right. Thank you. But at the time, there was no question about that. And there's been no evidence in the record that she reached out and asked about that. In fact, she signed that permanent modification within days of receiving it in December of 2013. She also had to do that to save her house. But are those attorney fees regulated by anything? That's a great question. I am not sure. The foreclosure action went on for quite some time. It was filed in March of 2010 and was dismissed. I believe the parties entered into a stipulation to dismiss it in January of 2014. So you're talking about nearly four years of litigation. On top of that, she also filed for bankruptcy. And it's possible that they incurred costs associated with bankruptcy as well. Are you aware that there are cases that have found consideration in these TPPs? We have not found cases specifically that say that the consideration that they're alleging here is something that can give rise to a binding contract. I agree with you that there is no case that says that declaring bankruptcy is. Right. But there are cases that look at it, at the agreement, and say that the undertaking to do credit counseling or to provide additional information, that because they're not in the original agreement, that that does provide consideration? Now, here, this case is distinguishable because I don't believe that they made her do any of that. What they asked of her was to do actions that were already required by the original mortgage. And it's clear under Florida law that preexisting duty does not give rise to consideration. So, for example, the subordination agreement, which they have alleged is the consideration for this agreement. The subordination is a requirement of the mortgage. Paragraph 4 of the mortgage says that they will make sure that this lien has first lien priority. When does it become a contract? Or is it never a contract? Is the TPP never a contract? The TPP is an agreement to agree. And there's a case that we said it's not a contract. It's more of an agreement to agree, essentially. It sets forth, here's what we are offering. If you can satisfy these conditions, then we're going to go ahead and modify this. But if you look at the terms, they're too indefinite. While they do say it will be based off of your income, that income can fluctuate. So the agreement is when you send the new documentation. That's the agreement? The permanent modification that they signed is an agreement. It's an agreement that is an addendum to or a modification of the existing mortgage. And, in fact, in the TPP letter, they explain that the remaining terms of your mortgage will remain in full force in effect. And that's what happened here. And that's why they needed her to obtain the subordination agreement. Her loan balance at that point had gone higher than what the original debt amount was that they filed the lien on. So what is the consideration for that agreement? The original consideration for her agreeing to make sure we had first lien priority was giving her the money to buy the house. I'm sorry, what? The original consideration for the subordination and requiring that we—I'm sorry, I'm not sure I'm understanding your question. Let me ask you, what is the consideration— She said it was giving her the money to buy the house. That's what she said. Yes, but what was the consideration that she's giving you on that modification? On the modification? She's ensuring that our loan remains in first lien priority. She is ensuring that she is complying with the original mortgage. So the original mortgage says you need to make sure we have first lien priority. And if there is a junior lien or another lien that threatens that priority, then you're going to take a number of actions. And one of them is to try to work with that other lien holder to make sure that that doesn't happen. But that's in the original agreement. Correct. So I'm just asking you, what is it about the new agreement that she eventually signed that has consideration where the TPP doesn't have consideration? So that's an excellent question. And, you know, the new agreement, she is now getting back into a permanent loan situation where she's current. I mean, the company is obviously vested in having the entire debt paid off, whereas before it didn't look like it. I recognize that's probably not the most artful answer in light of the fact that she had a preexisting duty from the very beginning. And so, you know, ultimately the loan modification is an extension of the original mortgage. The consideration had already been provided at the time of origination. And this was changed in the terms to benefit her. The point was to help her stay in her house. So aren't you really saying that it's not that there isn't consideration? It's just that during that TPP period, it's just too indefinite. It's all conditional. Well, it's all conditional. Yeah, it's two arguments really, right? So it's the TPP itself cannot be a contract because it's too indefinite. The terms were not spelled out. We did not have a meeting of the minds. There were several examples set forth in it, especially including the fact that the interest rate may be fixed. It might be variable if they offered her a below market interest rate, which is what they did, by the way. So her payments were actually much lower than the TPP payments ultimately when they offered her the permanent modification. So that's the indefinite terms argument as to why this cannot be a contract. However, we also have the idea that there was no consideration that would make this an enforceable agreement either. And that is the argument that the magistrate and the district court judge looked at in finding that the breach of contract claim had to fail. So if you would like, I'm happy to touch on the other two claims, or actually three claims that are outstanding. My counsel didn't get to touch on them, but they are before you, and I'm happy to address those as well since I have five minutes left. It's entirely up to you whether you want to address those or not. If I may briefly. So the first count is for the Florida Deceptive and Unfair Practices Act claim. There is admittedly a split of authority in Florida. The majority view is the one that is correct, and it's the one that was adopted by the district court. That view is that the exemption in the statute that says if you are a bank regulated by the federal government, the statute does not apply. The minority cases have looked at an erroneous interpretation of the statute. That interpretation reads an and into the statute, which is actually an or. It looks at persons or activities that are regulated by the federal government. Here, you look at the person being obviously a legal person, and we are Flagstar Bank FSB. The plaintiff acknowledges in the amended complaint in paragraph two that we are a federal savings bank. In fact, further to that point, he also attaches a CFPB consent order that illustrates the federal regulation of Flagstar Bank. You don't get to the activity question because the plain language of the statute, and this is what the district court found, and there are several other cases that have found this as well, doesn't require you to do that. If you are able to satisfy the fact that the entity itself is regulated, then you don't even ask the question about the activity. You only get there if the entity itself is not actually regulated. Then you can argue, well, the activity still is, and therefore the exemption would apply. Regardless, even if we got past that hurdle, and it's insurmountable for the plaintiff, the activity complained of here, which is loan servicing, is not activity that is in trade or commerce as set forth in the act. There are several cases that find that as well. That would be another reason upon which their claim would fail. I mentioned there was a fourth claim that goes along with the breach of contract claim, which is the breach of good faith and fair dealing. Obviously, it's derivative of the breach of contract claim. To the extent the breach of contract claim fails, which the district court correctly held it did, so did the good faith and fair dealing claim. Then the last claim is under the Real Estate Settlement Procedures Act, RESPA. This relates to a series of emails that were sent between counsel for the parties. That claim is time barred. At the time, RESPA required you to provide a response within 60 days to the substantive issues raised in a QWR. That's since changed to a smaller period of time, but at the time it was 60 days. That 60 days ran in October of 2013, and this case was not filed until December 19th of 2016. A plaintiff has advanced the creative argument that the statute of limitations does not start running because you need to have damages. That's an essential element of a RESPA claim under 2605. The problem with that, other than the fact that there is absolutely no case law supporting this claim, is that she was aware of what she's alleging her damages to be. In her complaint, in paragraph 50, she alleges that she received the permanent offer on December 11th of 2013, and she signed it a week later. That was still outside of the three-year window for statute of limitations purposes. That TPP identified that her principal balance had increased to $85,000 on 100. The $85,000 of which she complains are her damages now. So she was aware of her damages at the time. And then finally, as an attorney personally, I find it quite terrifying to take the position that's not supported, that emails between lawyers that are representing servicers and borrowers can be construed as QWRs. I'll tell you, in practice, when we see a QWR, it is clearly identified as a QWR and sometimes sent through us, and then we'll handle it that way. But an email just saying, hey, what's the status of this loan modification agreement, to find that you can give, that would give rise to a RESPA claim would just create such a dangerous precedent and was clearly not intended by Congress. And that is all I have, unless you have any other questions. Thank you very much. Thank you. May it please the Court. With respect to the RESPA claim being time barred, I would like to draw to the Court's attention two cases that recently were enunciated that support the argument that I'm making directly. The first was by the United States Supreme Court in 2018, China Agritech versus Resch. There, the United States Supreme Court said that a statute of limitations begins to run when a course of action accrues, that is, when the plaintiff can file suit and obtain relief. The and obtain relief is important because Ms. Nino could not have filed suit and obtained relief until she had a claim for damages. That's why her RESPA claim was timely filed because the damages for the RESPA claim that she's asserting accrued when she executed the contract and when Flagstar countersigned the contract. Judge Keflage, in this Court, in 2018, in Jordan versus Blount County, 885 F. 3rd 413, also found that a claim accrues when the plaintiff can file suit and obtain relief. Ms. Nino would have been unable to obtain relief. Are those statutory claims that both cases are addressing or are they common law claims? That I'm not entirely clear on, Your Honor. I apologize that I don't know exactly which claims that they're speaking to in the particular context. I know that the China Agritech claim was dealing with a statute of limitations on a successively filed class action, which leads me to believe that it might be a common law theory rather than a statutory claim. But here, it's undisputed that- Let's assume for a second that those are common law claims. We'll check. But if they're common law claims, then why would that language in those two cases change what seems, at least, to be clear on its face, the statutory text here? You got to file within 60 days of X and it went by. Well, no, the QWR simply says that they have to respond within 60 days of receiving a QWR. I misspoke. It's three years, not 60 days. Right. Because the district court is starting the clock at a time when she has no damages because the TTP or the loan modification has not been executed. And so, therefore, there's no damages. And so, therefore, there's an inability to obtain relief because damages are a requirement to state a claim under RESPA. And so, if you're starting the clock at a time when the litigant cannot obtain relief, then that's contrary to the language in those particular cases. And finally, the district court- I see that I'm out of time. My apologies. Thank you, Your Honors. All right. Thank you, and the case is submitted. There being no further questions-